JONES *v.* GILBERT.

1. The issue being whether the plaintiff delivered to the defendant the kind of policy of insurance for which the latter had stipulated and which the plaintiff had agreed to deliver, evidence of the value of the policy actually delivered was irrelevant, and therefore inadmissible.

2. One who orders a policy of insurance of a particular class, and gives his note for the amount of the premium which the agent of the company had advanced, has a reasonable time within which to discover that a policy sent to him by mail is not of the class ordered, and to object to and return the same. If his offer to return, made in due time, be rejected, his retention of the policy thereafter, without appropriating it or making any use of it, will not subject him to pay the note.

3. Although the evidence was decidedly conflicting, and seemingly predominated in favor of the plaintiff, yet the jury being the sole judges of credibility, and the court below having approved the finding, the judgment denying a new trial will not be reversed.

March 26, 1894. Argued at the last term.

Complaint on note. Before Judge ATTAWAY. City court of Cartersville. March term, 1893.

JOHN W. AKIN, for plaintiff.

ALBERT S. JOHNSON, for defendant.

LUMPKIN, Justice.

Gilbert applied, through one Cade, for a policy of insurance in the Mutual Life Insurance Company of Kentucky, and received what was known as a " twenty-payment life" policy. Being dissatisfied with it, he requested Jones, general agent of the company for the States of Georgia and Alabama, to substitute for it another policy of a different kind. This Jones agreed to do, and accordingly took up the policy held by Gilbert, who at the same time made and delivered to Jones a promissory note for $92.04, which was the amount of the first annual premium upon the new policy Gilbert was to receive. This note was made payable to the order of Jones, and it was understood that Jones was to advance to the company the money for the premium, it being a rule of the company to require payment in cash of the first premium upon every policy issued by it. Jones procured a " ten-payment life" policy and forwarded it, by mail, to Gilbert, who, after keeping it several weeks, brought it back to Jones, stating that it was not the kind of policy he had applied for, offering to return it, and demanding the surrender of his note. Jones refused to take the policy or to give up the note. He afterwards brought suit upon the note against Gilbert, and the defence to the action was, in substance, that Jones had agreed to obtain for Gilbert a " ten-year endowment " policy and had failed to do so, but on the contrary, had obtained and forwarded to Gilbert the " ten-payment life" policy above referred to. The controlling issue on the trial, therefore, was whether the plaintiff had delivered to the defendant the kind of policy of insurance for which the latter had contracted, or a policy of a different kind.

It does not appear that, at the trial in the court below, the plaintiff insisted that the defendant was estopped from returning the policy by reason of the fact that he

had retained possession of it for some time before offering to surrender it. The main contention of the plaintiff was, that the defendant had no right to return the policy at all, for the reason that it was exactly the kind of policy the defendant had ordered, and which the plaintiff had, in consequence, procured for him. The plaintiff's theory was, that even if the defendant had offered to surrender the policy within an hour after he received it, he would have had no right to do so, because the delivery to him of this identical policy was an exact, full and complete compliance by the plaintiff with his contract. On the other hand, the contention of defendant was, that he did have a right to return the policy, because it was not of the kind for which he had contracted; that promptly upon discovering it was of a different kind, he had endeavored to see the plaintiff for the purpose of returning it, had been to his office for this purpose two or three times and found the plaintiff absent, and that finally, upon finding the plaintiff in his office, he had offered to surrender the policy for the reason already stated, and for this reason alone, but that the plaintiff had declined this offer, and had refused to surrender to defendant his note, for which demand was duly made.

1. The court was right in rejecting evidence as to the value of the policy delivered to the defendant, because, in view of the controlling issue. above stated, this evidence was clearly irrelevant. If the policy received by the defendant was in fact of the kind for which he had contracted, he was bound to pay the note; otherwise, he would not be bound to take the policy, no matter what its value. It was, therefore, entirely immaterial what was the precise value of the policy, the fact that it had some value not being denied.

2. There was no real contest in this case upon the question as to whether or not Gilbert had, by the mere

lapse of time, lost his right to return the policy which Jones had sent to him by mail. We do not think it necessary to cite authority to show that Gilbert had a reasonable time within which to discover that the policy was not of the kind he had ordered, to object to it, and to offer to return the same; and it can scarcely be doubted that a period of about six weeks would not, as matter of law, be an unreasonable time for these purposes, under the circumstances of this case. Assuming, then, that the offer to return was made within a reasonable time, we do not think that the mere retention of the policy by Gilbert, after the rejection by Jones of his offer to return the same, would render Gilbert liable to pay the note for the amount of the premium which Jones had advanced to the company. After the latter had declined to take back the policy and give up Gilbert's note, we do not see how keeping the policy in his possession should injuriously affect Gilbert's rights in the premises. There was really nothing else he could properly do with it. He was under no obligation to return it to the company and leave his note outstanding against him. He made no use of the policy, nor did he derive any benefit from it. His holding of it was simply for the benefit of Jones and subject to his order, though Gilbert was under no obligation to return it without a surrender of his note.

It was insisted for the plaintiff, in this connection, that the policy was a binding contract upon the company, and that if Gilbert had died with the policy in his possession, his wife, to whom the policy was payable, could have compelled payment to her by the company of its face value. Whether this be so or not, nothing of the kind actually happened, and it does not appear that either Gilbert or his wife derived any benefit whatever from the policy. Of course, if either or them had collected anything on the policy, pledged it

as security, or made any use of it at all, the question would be entirely different. What might have been the equities between Mrs. Gilbert, Jones, and the company, in the event Gilbert had died while retaining possession of the policy, it is not now necessary to inquire. Simply because a possible opportunity may have been afforded Mrs. Gilbert, innocently or otherwise, to make a wrongful claim under the policy in case of her husband's death, it will not be gratuitously assumed that she would have done so, or that Gilbert contemplated such possible use of the policy and sanctioned it in advance.

Upon the facts as found by the jury, Gilbert was simply holding in his possession a paper belonging to Jones, to the possession of which Jones would have become entitled by returning Gilbert's note. As Jones, however, refused to thus obtain possession, he cannot compel a payment of the note simply because, by reason of such conduct on his part, a benefit might possibly have accrued from the policy to Gilbert's wife to which, in strict justice and equity, she would not have been entitled. It would be a somewhat analogous case if one should order goods of any kind, give a note in advance for their value, and when the goods were received they should not be of the kind ordered. In such a case, it would be the right of the purchaser to return the goods and get back his note; and if the seller refused to take back the goods and surrender the note, then the purchaser could lawfully retain possession of the goods, for his own protection, and for the seller's use. Simply doing this would not render the purchaser liable to pay the note; but if he consumed, or in any way used the goods as his own, he would be liable at least for their value. In principle, the case at bar is a case of this kind.

3. All of the foregoing has been written upon the

theory that the jury correctly found the disputed issue in favor of the defendant. In point of fact, this appears to be an exceedingly hard case. The following, quoted literally from the defendant's testimony while on the stand as a witness, covers about all he testified which was material as bearing upon the vital issue involved in the case: "I knew that the premium would be higher on the last policy than on the first policy. Of course, I knew what the premiums were, and that one was fifty-seven dollars and some cents, and the other $92.04. Plaintiff said that I would get the whole face of the policy, $2,000.00, back at the end of ten years on this last policy which I took, and that is the kind of policy I told him I wanted. I was to get this. Plaintiff and I did have some talk about different kinds of policies. I do not know what all we said. I signed the note sued on, and plaintiff said he would get the kind of policy I wanted and send it to me. I soon afterwards received by mail this policy," indicating the ten-payment life policy produced by himself.

The plaintiff's version of what occurred between himself and Gilbert was as follows: "I had no personal knowledge of the application of defendant to Cade. My first personal connection with the matter was when defendant came to my office and brought back the twenty-payment life policy which had been issued him on his application given to Mr. Cade. He said he was dissatisfied with it and wanted to change it; that he would have to pay money too long; that his family would be growing up before the policy was paid up, and he would be needing the money to send his children to school. I got my rate book—the same I now have in my hand—and explained to him the different kind of policies we issued, the rates, etc., etc. There were four policies which we talked about and which he considered. One was the ten-year endowment, wherein premiums are

v 93-39

paid annually for ten years, and at the end of that time, the face of the policy is paid. Another was the twenty-year endowment, just the same as the other, except premiums continue for, and payment is made at the end of, twenty years. Another was the twenty-payment life, on which premiums are paid for twenty years, and at the end of that time, premiums cease and the policy is paid up in full, and the beneficiary gets the full amount at the death of the insured. The other was the ten-payment life, the same as the last named, except the premiums continue for, and the policy is paid up at the end of, ten years. On the two latter, dividends are payable after the maturity of the policy, although no premiums are then to be paid. On all, dividends are payable from the date of the policy. The dividends cannot be determined exactly, but will approximate, for ten years, twenty-five to thirty per cent. on the aggregated amount of the premiums. On all these policies, the face of the policy would be payable at the death of the insured, if it occurred before the policy was paid up. At defendant's age when the policy in controversy was issued, the four following policies for $2,000.00 each would be worth the following annual premiums, respectively: On ten-year endowment, $208.86; on the twenty-year endowment, $96.66; on the twenty-payment life, $59.42; on the ten-payment life, $92.04. I explained all this to Mr. Gilbert, and told him the difference in the policies, about as I have testified. He first said he wanted a ten-year endowment; that is, where he could get the whole amount of the face of the policy, payable in ten years; but the premium on that was so heavy that he concluded he would take the ten-payment life. I explained to him that in both the ten-year endowment and the ten-payment life, premiums would have to be paid only for ten years; that in the former, the premiums would be over twice as much as in the latter; that in both cases,

the policies would be paid up at the end of ten years; that in the ten-year endowment, he would get his money at the end of ten years, but that his premiums would aggregate more than the face of the policy, while in the ten-payment life, his premiums would aggregate less than half the face of the policy, and he would not get the face of the policy until dead, though I told him that he could, at the end of ten years, if he desired, sell his policy back to the company for between seven and eight hundred dollars, if he withdrew his dividends, or about eleven hundred dollars, if he let his dividends stay in. I explained to him that if he would agree not to withdraw his dividends, and make this election on taking out the policy, then the guaranteed value of the policy, at the end of ten years, would be about eleven hundred dollars; but he said he wanted to use his dividends in reducing the premiums; and consequently, the paid-up value could not be guaranteed, but it would have some guaranteed value, which, according to the experience of the company in past years, would be between seven and eight hundred dollars. All this I told him and explained to him, and he finally concluded to take the ten-payment life policy. He expressed his satisfaction, and I did not hear any complaint, and I never heard of any complaint until about six weeks or two months afterwards—possibly a little longer—when he came to my office, bringing back the policy, and said he was dissatisfied with it and wanted his note back."

The above account of the conversation between the plaintiff and the defendant was fully corroborated by another witness named Quillian, but it is fair to say the defendant testified that Quillian was not present at the interview between Jones and himself when the change of policies was requested. There is no real conflict between the testimony of Gilbert and that of Jones and Quillian, except upon the one question as to whether

Gilbert was to have a "ten-year endowment," or a "ten-payment life" policy. Upon this question there is undoubtedly an irreconcilable conflict, but it will be readily perceived that the version of this matter given by the plaintiff and Quillian is far more likely to be accurate and correct than that of Gilbert. It would therefore seem that the jury ought to have found for the plaintiff, and we would have been much better satisfied had they done so. Indeed, we were tempted to grant a new trial on the ground that the verdict was contrary to the evidence; but after anxious and careful study and deliberation, we find it is impossible for us to do so without invading the province of the jury, and this we are not permitted to do. This case must inevitably turn upon the credibility of the witnesses, a matter over which the jury are vested with absolute and exclusive control. Hard cases often result in the making of bad law. This we wish conscientiously to avoid, even though, in a particular case, injustice results. As long as our system of jury trial exists, it is our duty to uphold and maintain it, and this we feel constrained to do regardless of consequences.

The trial judge could, with the utmost propriety, have granted a new trial in this case. He had a discretion to exercise. We have none. Had he granted a new trial it would have met our full approbation. As he declined to do so, it is not the province of this court to disturb his judgment.          *Judgment affirmed.*